[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
In these consolidated cases, Plaintiffs William McKeown, Constance C. Coles, and James R. Vivian have filed administrative appeals of the decision of the defendant Clinton Zoning Board of Appeals (hereinafter the Board) to approve the granting of a certificate of zoning compliance to defendants Michael DeBaggis, Jr. and Joann DeBaggis. The certificate was for the construction of a dwelling on land in the Town of Clinton then owned by the other individual defendants: William A. Parsons, Elizabeth W. Parsons, Stephen Parsons, and Irene Parsons. Trial and argument of the administrative appeal took place in this Court on May 20, 1999. Pursuant to this court's order, the parties filed supplemental briefs on or about July 6, 1999. For the reasons CT Page 9726 stated below, the court sustains the plaintiffs' appeals, reverses the decision of the Board, and remands the matter to the Board for further proceedings.
BACKGROUND OF THE CASE
The administrative record reveals the following background of the case. On or about August 29, 1996, Michael DeBaggis, Jr. filed an application with the Clinton Planning and Zoning Commission for a rear lot special exception pursuant to § 19.13 of the Clinton Zoning Regulations (hereinafter Regulations) in order to construct a single family dwelling at 75A Waterside Lane in Clinton ("lot 75A").[1] The application identified the owners of the property as William and Elizabeth Parsons, whose address was 75 Waterside Lane. The subject premises were described as being 1.44 acres of land, more or less.
On January 13, 1997, the Planning and Zoning Commission addressed this application. One of the documents before the Commission was a letter from Arthur J. Castellazzo, a sanitary engineer with the Connecticut Department of Public Health. The letter discussed a possible easement exception for the installation of a future reserve subsurface sewage disposal system at 75A Waterside Lane. The letter stated the following:
 From the beginning of our involvement with this application, it has been our position that the approval of the easement exception is contingent on the existence of Lot 75A prior to 1982 (August 16, 1982, the effective date of Section 19-13-B103 of the Public Health Code). It is our understanding that this lot has existed as a separate undeveloped lot since that time. The Town of Clinton's 1979 Grand List refers to this lot as 56-64-55. The other two lots associated with this parcel are identified as 57-65-55A and 56-64-57.
At the hearing, a member of the Commission stated that "in light of the documentation provided to us tonight by the Zoning Enforcement Officer [which apparently included the Castellazzo letter], the rear lot already existed in 1979. Therefore, the proposal in front of us is just a lot line revision which does not require Planning and Zoning Commission approval." The Commission went on to approve DeBaggis' s coastal area management site plan and recommend that DeBaggis withdraw the application for a special exception. Immediately thereafter, the DeBaggis CT Page 9727 withdrew the application.
On or about April 8, 1997, the DeBaggis submitted an application for a building permit, flood hazard area permit, and certificate of zoning compliance. The application listed the location of the subject property as lot 55A on assessor's map 57A, otherwise known as 75A Waterside Lane. The application identified the owners of the property as "Mr. and Mrs. Michael DeBaggis" and the lot size as 1.4 acres. The application described the proposed work as construction of a three bedroom house and attached garage. On April 8, 1997, the zoning enforcement officer granted the zoning certificate. The town health department and building official subsequently approved the other parts of the application.
Plaintiffs McKeown and Coles, of 73 Waterside Lane, and plaintiff Vivian, of 64 Waterside Lane, appealed the decision to the Board. At the public hearing on August 20, 1997, the attorney for the DeBaggis stated that the application was in error in that the actual acreage was 6.5 acres, not 1.4 acres, and that the Parsons were the owners of record, not the DeBaggis.[2] Among the items submitted to the Board as exhibits were the file of proceedings before the Planning and Zoning Commission, two 1977 agreements between the Parsons and the Waterside Preservation Association concerning the area in question, the 1979 and 1980 Clinton grand lists, and a November 1, 1996 map and survey of the affected area.
At the conclusion of the hearing, the Board voted three to two in favor of a motion to sustain the appeals. Although there is no formal statement of reasons, the reasoning of one member of the majority was that there was insufficient documentation of two existing lots. Only one of the two members of the minority made any substantive comments and his basis for voting to uphold the zoning officer's decision is not clear. Because General Statutes § 8-7 requires the "concurring vote of four members of the zoning board of appeals" to reverse any order of a zoning enforcement official, the motion did not pass and the Board's vote had the effect of affirming the zoning officer's decision. This appeal followed.
DISCUSSION
 I. CT Page 9728 A. Aggrievement
As an initial matter in an administrative appeal, the plaintiffs must establish that they are aggrieved by the decision of the administrative agency. See Northeast Parking, Inc. v.Planning Zoning Commission, 47 Conn. App. 284, 287,703 A.2d 797 (1997), cert. denied, 243 Conn. 969, 707 A.2d 1269 (1998); Conn. Gen. Stat. §§ 8-8(b); 22a-43(a). The plaintiffs testified in court that they were abutting land owners from at least the time of the Board's decision through the time of trial. There was no dispute of this testimony. The court finds that the plaintiff has proven aggrievement. See Smith v. Planning ZoningBoard, 203 Conn. 317, 321, 524 A.2d 1128 (1987).
 B. Timeliness and Service of Process
General Statutes § 8-8(b) requires that an appeal from a decision of a commission "shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date the notice of the decision was published." General Statutes § 8-8(e) provides that service "shall be made be made by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality." Section 8-8
(f) requires service of process "on each person who petitioned the board in the proceeding, provided his legal rights, duties or privileges were determined therein."
The record reveals that the Board published notice of its decision in the Clinton Recorder newspaper on August 26, 1997. On September 8, 1997, plaintiffs McKeown and Coles effectuated service on the Chairman of the Board, the Town Clerk, and the private defendants. Because plaintiffs McKeown and Coles served the required persons within the relevant fifteen day period, the court finds that service of their appeal was proper and timely.
Plaintiff Vivian's citation commands the sheriff to summon the Board and the private defendants, but makes no reference to the town clerk. Similarly, the sheriffs return reveals service on the chairman of the Board and the private defendants on September 9, 1997, but does not mention any service on the town clerk. This defect is not fatal. Section 8-8(f) specifically provides that "failure to make service within fifteen days on parties other CT Page 9729 than the board does not deprive the court of jurisdiction over the appeal." Surely the same rule applies when, as here, the plaintiff has failed to serve a person, such as the clerk, who is required to be served "for the purpose of providing notice of the appeal to the board" but does not otherwise become a "necessary party to the appeal." General Statutes § 8-8(e). The remainder of § 8-8(f) authorizes the court to make orders to insure that all parties receive fair notice and to take other steps, including dismissal, in the event that "the failure to make service causes prejudice to the board or any party." General Statutes § 8-8(f). In the present case, the plaintiff did put the Town on notice by serving the board chairman and there is no evidence that the Town was prejudiced in any way by the plaintiffs failure to make complete service. The zoning appeal statute also provides that "[t]he right of a person to appeal a decision of a board to the Superior Court, and the procedure prescribed in this section, shall be liberally interpreted in any case where a strict adherence to these provisions would work surprise or injustice." General Statutes § 8-8(p). Based on these factors, the court finds that service by plaintiff Vivian, while not fully in accordance with the statute, was nonetheless sufficient to confer jurisdiction on the court.
 II.
The merits of these appeals focus on whether lot 75A, which the DeBaggis intended to purchase and develop, existed as a rear building lot prior to the enactment of § 19.13 of the Regulations. The Town concedes, and the Regulations themselves disclose, that the rear lot provisions of the regulations came into effect on August 1, 1977. See Regulations, Amendments — Text of Regulations, p. 1. If lot 75A was a rear building lot prior to August 1, 1977, the property would be a "non-conforming use" that "may be continued" pursuant to § 13.1 of the Regulations.[3] In that event, the requirement of § 19.13 to obtain a special exception from the Commission would not apply. See note 1 supra. As our Supreme Court has stated: "Where a nonconformity exists, it is a vested right which adheres to the land itself And the right is not forfeited by a purchaser who takes with knowledge of the regulations which are inconsistent with the existing use." Petruzzi v. Zoning Board of Appeals,176 Conn. 479, 483, 408 A.2d 243 (1979) (internal quotation marks omitted).
The plaintiffs conceded at oral argument that the Parsons' CT Page 9730 property at 75 Waterside Lane was a nonconforming rear lot in that it had only fifty feet of frontage in an R-20 zone that normally requires 110 feet of frontage. See Regulations §§ 8.2.[4] and 8.7. The plaintiffs' principal argument is that there was insufficient evidence to support the Board's conclusion that a second rear lot — what is now called lot 75A — existed in that area on August 1, 1977. The plaintiffs reject the claim that the board approved a mere "lot line revision," and contend that they had no notice that the board was considering such a revision.
In challenging administrative agency action, the plaintiffs have the burden of proving that substantial evidence does not exist in the record as a whole to support the agency's decision. See Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587,628 A.2d 1286 (1993). The plaintiffs must do more than simply show that another decision maker such as the trial court might have reached a different conclusion. This court does not retry the case de novo. Id. "In applying the law to the facts of a particular case, the board is endowed with a liberal discretion, and its decision will not be disturbed unless it is found to be unreasonable, arbitrary or illegal." Spero v. Zoning Board ofAppeals, 217 Conn. 435, 440. 586 A.2d 590 (1991).
"Substantial evidence" means something less than the weight of the evidence. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's decision from being supported by substantial evidence. See Samperi, supra, 226 Conn. 588. "The substantial evidence standard requires enough evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Kaufmanv. Zoning Commission, 232 Conn. 122, 151, 653 A.2d 798 (1995) (internal quotation marks omitted).
A key piece of evidence submitted to the Board was the finding by the Planning and Zoning Commission that a second "rear lot already existed in 1979" and that therefore a special exception was not necessary. While this determination deserves deference because of the special knowledge and expertise of zoning commissions, the fact is that the Commission's finding addresses the situation in 1979 and not in 1977, when the regulations came into effect.
Supporting the finding of the Commission was the Castellazzo CT Page 9731 letter, which concluded that lot 75A "has existed as a separate undeveloped lot since [1982]." The letter, as quoted above, referred by lot number to this lot and two associated lots in the October 1, 1979 grand lists. These grand lists were also in the record before the Board. They show that Elizabeth Parsons owned a parcel of land identified as 75 Waterside Lane and that an entity identified as the Parsons Company owned two parcels of land apparently identified as 77 Waterside Lane.[5] These three properties have three separate lot numbers that match the lot numbers in the Castellazzo letter. Thus this evidence establishes that members of the Parsons family owned lot 75A as early as 1979. Here again, however, this evidence postdates the critical date of August 1, 1977.
Also of importance was a certified survey map submitted by the DeBaggis with their application. This map was completed on November 1, 1996 and certified as substantially correct by Arthur E. Barden, a registered professional land surveyor. The map focuses on two parcels of land along the eastern side of the Indian River. The first is parcel MS7A-B65-L55A, also known as 75 Waterside Lane. This lot was owned at the time by defendants William and Elizabeth Parsons and was then 3.04 acres. The second parcel is identified as M56-B64-L55, also known as 67 Waterside Lane. Its owners at the time were defendants Stephen and Irene Parsons. The size of the parcel was 5.02 acres. These two lot numbers — M57A-B65-L55A and M56-B64-L55 — correspond with two of the lot numbers in the 1979 grand lists and the Castellazzo letter used to identify the Parsons' property.[6]
The survey also identifies a "Proposed Lot 75" and "Proposed Lot 75A." Proposed Lot 75 consists of the first parcel with its northern lot line moved to the south. It was to be deeded to William and Elizabeth Parsons, contain 2.38 acres, and remain known as 75 Waterside Lane. It would lose approximately 1.48 acres because of the lot line change but gain approximately .82 acres by merging with an adjoining marina basin lot — number M57A-B65-L6OA — then owned by the same Parsons.
Proposed Lot 75A on the survey map consists of the second parcel with its existing southern lot line moved further south so that the parcel would contain 6.50 acres. It would encompass all 5.02 acres of the second parcel plus the additional 1.48 acres of the first parcel. The new parcel was to be deeded to Michael and John DeBaggis and be known as 67 Waterside Lane. CT Page 9732
This map does supply further evidence that, prior to the DeBaggis's application, the Parsons family owned two contiguous but separate parcels of land known as 75 and 67 Waterside Lane. As the Town points out, contiguous land owned by the same person does not necessarily merge into a single lot. Marino v. ZoningBoard of Appeals, 22 Conn. 606, 609, 578 A.2d 165, cert. denied,216 Conn. 817, 580 A.2d 58 (1990). Indeed, in this case, the owners of 75 and 67 Waterside Lane were not the same but were different members of the Parsons family.
The map, however, does not provide the necessary support for the Board's decision. Initially, it is not clear why the map identifies Proposed Lot 75A as having an address of 67 Waterside Lane while the DeBaggis's application identifies the address as 75A Waterside Lane. This matter appears to be another error that the DeBaggis did not correct at the hearing. More significantly, the map, which was completed in 1996, does not establish that 75A Waterside Lane (or 67 Waterside Lane, as the map labels it) existed as a separate rear lot on August 1, 1977.
The final items of evidence relied upon by the parties are two agreements between the Parsons and an entity called the Waterside Preservation Association. These documents both narrowly postdate August 1, 1977 although they arguably shed some light on the status of land on that date. The first document, dated August 16, 1977, is entitled "Memorandum of Agreement among William A. Parsons; James A. Vivian,[7] Representing the Waterside Preservation Association; and Daniel Vece, First Selectman of the Town of Clinton." The agreement provides that Parsons will remove fill material from property along the Indian River north of a "line to be fixed by the Town Surveyor." Parsons was then to deposit the material in two areas of property, which had already been filled to some extent, owned by the Parsons Company and located south of the "surveyed line." As described in the agreement and shown by a June, 1979 map prepared by Eric A. Anderson that accompanies a newsletter concerning the agreement, the more southerly of the two areas south of the line was an 1.8 acre parcel that had been excluded from the jurisdiction of the Clinton Inland Wetlands Commission. The other area was within the Wetlands Commission's jurisdiction. Paragraph six of the agreement then recites that Parsons intends to build one single family residence on the far southern end of the area to be filled "under the rear lot provisions of the Zoning Regulations on a rear lot in the new R-20 zone with an access way across the property at 77 Waterside Lane . . ." (emphasis added). Paragraph six CT Page 9733 concludes that "by developing the area remaining filled under thenew rear lot provisions (notably paragraph 2b which limits adjacent access ways to no more than two), future development of the area remaining filled will be restricted to one additional — or a total of two — single family residences." (emphasis added).
The second agreement is an August 31, 1977 stipulation for dismissal of Waterside Preservation Association v. General JohnMason, No. N75-S3 (D. Conn. Aug. 31, 1977), signed by lawyers for plaintiff Waterside Preservation Association and defendants William A. Parsons, Elizabeth W. Parsons, and W.A. Parsons Company. The stipulation similarly provides that fill material will be removed from a northern portion of property owned by the W.A. Parsons Company along the eastern edge of the Indian River north of a "line of demarcation" shown on the June, 1976 Anderson map. The fill material was to be deposited on two areas of property owned by the Parsons Company south of the line of demarcation and otherwise described similarly to their descriptions in the prior agreement. Paragraph four of the stipulation provides that William and Elizabeth Parsons intend to build a single family residence on the 1.8 acre southernmost parcel of land within the subject area. Paragraph 4c then states:
 It is the intent of the parties that a subdivision not occur on defendants' property south of the referenced lime of demarcation, but that any development of the property referred to in this pararaoh shall be in accordance with the rear lot provisions of the Town of Clinton Zoning Regulations as applicable to an R-20 zone, and any access to such property shall be made across property owned by defendant Elizabeth W. Parsons, it being the intent of this condition to restrict development of the aforementioned property to a total of two single family residences.
(emphasis added).
The Board claims that these agreements reveal the knowledge of the parties of a second rear lot along the Indian River owned by the Parsons family on August 1, 1977, a date that precedes the signing of the agreements by only a few weeks. For several reasons, however, these agreements do not support the Board's decision. First, there are no detailed maps referred to in or accompanying the agreements. Although the parties concur that the properties discussed in the agreement are in the same general area as the properties that are the subject of this case, the CT Page 9734 precise location of the "surveyed line" and the "line of demarcation" is not clear. Accordingly, it is not clear that the more northerly parcel of the two parcels south of the surveyed line (hereinafter the "middle parcel"), which is described as one where a second residence would be built, is precisely the same as the southerly portion of Proposed Lot 75A as shown in the survey map.
Second, it is not clear that the middle parcel constituted a "lot" as defined by the Regulations.[8] The only arguably applicable portion of the definition is a "parcel of land which is owned separately from any adjoining lot or lots as evidenced by a [recorded] deed." In this case, there is no evidence in the agreements or elsewhere that a deed existed showing separate ownership for the middle parcel. Indeed, as stated, see note 4 supra, the record does not even establish, by deed or otherwise, that 75 Waterside Lane existed as a separately owned lot on August 1, 1977. The most that the record reveals is that Elizabeth Parsons acquired 75 Waterside Lane by deed dated March 28, 1978 — almost seven months after the enactment of the zoning regulations. Since that time, there have been a number of sometimes confusing transactions of land in the area in question among various Parsons family members and entities. The record does not substantiate the tracing of any current title to a deed showing separate ownership of the middle parcel on August 1, 1977.
Finally, even assuming that the agreements show the existence of a second rear lot in the precise location of lot 75A, the agreements also show that, in developing the land, the parties fully intended to comply with the rear lot provisions of the regulations. Essentially, the parties decided to discontinue any status the middle parcel had as a nonconforming lot. This decision apparently prevailed until the DeBaggis's application in 1997. Given these facts, the applicable regulations prohibit a resumption of the nonconforming use.[9]
The agreements, therefore, primarily because of their lack of clarity and precision, do not establish that lot 75A existed as a separate rear lot on August 1, 1977. It could be argued, of course, that the other evidence showing that lot 75A existed as a separate rear lot as early as 1979 supports the inference that lot 75A also existed on August 1, 1977. The court is unable to find that this inference alone constitutes the "substantial evidence" necessary to uphold the Board's decision. In any event, CT Page 9735 to the extent that the two 1977 agreements do address lot 75A, they show the intent of the owner to develop it in accordance with the rear lot regulations rather than continue it as a nonconforming use. In sum, the administrative record permits only an inference that lot 75A may have existed on August 1, 1977 and even that finding would be rendered immaterial by the possibility that the parties agreed to discontinue lot 75A as a nonconforming use. It follows necessarily that the Board lacked substantial evidence to support its conclusion.
In view of this finding, no need exists to address the other arguments raised by the plaintiffs. It suffices to note that the DeBaggis's case was based on an application replete with mistakes, that the plaintiffs did not have full notice that the hearing before the Board primarily concerned a proposed lot line revision, and that the zoning enforcement officer's decision was approved without a clear statement of reasons by only a minority of the Board.
CONCLUSION
For the foregoing reasons, this court sustains the plaintiffs' appeals. The decision of the Board denying the appeal of the plaintiffs is reversed and the case is remanded to the Board for further proceedings not inconsistent with this opinion.
It is so ordered.
CARL J. SCHUMAN JUDGE, SUPERIOR COURT